IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ARLENE FRY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:17-cv-0878 (AJT/TCB) |
| ) | |
| RAND CONSTRUCTION CORP., ) | |
| ) | |
| Defendant. ) | |
| ) | |

## **MEMORANDUM OPINION and ORDER**

In this action, Plaintiff Arlene Fry alleged that her former employer, Defendant Rand Construction Corporation, terminated her employment on February 3, 2017 in violation of the Family Medical Leave Act (Count I) and the Americans with Disabilities Act (Counts II and III). *See* First Amended Complaint [Doc. No. 27] ("FAC"). A jury trial began on April 23, 2018, and on April 27, 2018, the jury returned a verdict in Plaintiff's favor as to Count I, and in Defendant's favor on Counts II and III as well as Defendant's after-acquired evidence defense. [Doc. No. 112]. The jury awarded damages on Count I in the amount of $50,555, an amount which, as stated in the jury's verdict, was not reduced based on its finding in favor of Rand on its after-acquired evidence defense. Pending are Plaintiff's Rule 50 Motion for Judgment as a Matter of Law [Doc. No. 130] and Defendant's Motion for Judgment as a Matter of Law or for a New Trial [Doc. No. 133]. On June 25, 2018, the Court held a hearing on the Motions, following which it took them under advisement.

In her Motion, Plaintiff Fry seeks judgment as a matter of law on Defendant's after-acquired evidence defense. Defendant's Motion seeks judgment in its favor on Count I for FMLA retaliation, the sole count on which the jury found for the Plaintiff, on the ground that the

1

evidence adduced at trial was insufficient as a matter of law to establish that Rand terminated her in retaliation for her FMLA leave-taking and her complaints of retaliation based on her FMLA leave taking.

For the reasons stated in more detail below, the evidence at trial regarding the Defendant's after-acquired evidence defense—that it would have terminated Fry had it known she was retaining emails in violation of company policy—was sufficient to support the jury's finding in Rand's favor. Therefore, Plaintiff's Motion will be DENIED. As to Defendant's Motion, the evidence was insufficient as a matter of law to establish that Plaintiff's termination on February 3, 2017 was caused by either her taking FMLA leave from November 28 to December 12, 2016 or her complaints of retaliation in January and February 2017. Accordingly, Defendant's Motion will be GRANTED.

## I. BACKGROUND[1]

From June 30, 2008 to February 3, 2017, Plaintiff Fry was the administrative assistant to Linda Rabbitt, the founder and Chief Executive Officer of Defendant Rand Construction Corporation. In the early morning on November 3, 2016, Rabbitt became upset with what she regarded as a mistake in Fry's performance that caused Rabbitt to nearly miss an important meeting. That same day, in an email to Fry, Rabbitt complained of the mistake and told her "[t]his is a VERY important meeting..and [*sic*] if you screwed this up I will be really really angry." Def.s' Ex. 12.[2] Fry testified that after the incident, Rabbitt was "furious . . . but not talking to me." Trial Tr. 356:17. Shortly after her email to Fry, Rabbitt emailed Kurt Haglund, Rand's Chief Operating Officer, about the incident, saying "I think Arlene blew it. If [s]he did, I

---

[1] For the purposes of Plaintiff's Motion, the Court has considered the evidence in the light most favorable to the Defendant; and for the purposes of Defendant's Motion as to Count I, in a light most favorable to the Plaintiff.
[2] While the parties have attached and renumbered selected trial exhibits to their Motions, citations to exhibits in this opinion refer to the trial exhibit numbers.

need to replace her. She's making too many mistakes." Def.'s Ex. 11. Fry, who had access to Rabbitt's email for her job, saw the email to Haglund (on which Fry was not copied) and shortly thereafter asked Haglund during a chance encounter at the office whether he wanted to replace her, because she was concerned that Rabbitt wanted to replace her and believed that Rabbitt was giving Haglund permission to terminate her. *Id.*, 356:4–5; 422:4–9. Haglund responded "I do not want to replace you. Linda is just angry." *Id.* at 356:6–7. Following that exchange with Haglund, Rabbitt continued to be "furious" with Fry, but still was not speaking with her. *Id.* at 356:17–18. Later that same day, Fry solicited the help of Violetta Bazyluk, Rand's Human Resources Director, in arranging a meeting with Rabbitt and to accompany her in that meeting with Rabbitt "to convince her it's important enough for us to have this conversation [about what happened]." *Id.* at 357:17–20. Following her meeting with Bazyluk, Fry observed Rabbitt, Haglund, and Bazyluk in a conference room together. After Haglund and Bazyluck left the conference room, Rabbitt approached Fry, saying "'[w]e will talk about this, but not now because I am too angry.'" *Id.* at 358:12. Fry testified Rabbitt looked as if "she's [Rabbitt's] going to have a stroke. She's purple, purple with rage. She is so angry. Her voice is shaking." *Id.* at 358:9–11. The next day, November 4, 2016, Rabbitt gave Bazyluk a list of Fry's positive and negative attributes as an employee, including many more negatives than positives. Def.'s Ex. 13.

Haglund and Bazyluk testified that because of the November 3 incident, they understood that Rabbitt had made the decision to terminate Fry. *See* Trial Tr. 143:25–144:3 (Bazyluk testifying regarding the note she received from Rabbitt on November 4: "[Rabbitt] wanted to get rid of [Fry] and be done with this. She was not performing to her standards. So I understood that inevitably this employment will be terminated."); 246:16–18 (Haglund: "it became increasingly obvious to me in November that it was only a question of time [before Rabbitt replaced Fry].");

3

*see also id.* at 538:8–10 (Rabbitt testifying regarding the list she left for Bazyluk on November 4: "I was sort of in my head just proofing out that I just needed to do this. I just needed to replace Arlene Fry as my executive assistant."). Haglund and Rabbitt also testified that the implementation of that decision had been put off until after the upcoming holidays. *See id.* at 248:17–20 (Haglund testifying that Rand generally does not terminate employees at the end of the calendar year, because "it's an incredibly busy time of year [and] we generally try to be kind to our employees and we try not to terminate people at the end of the year . . . ."); *id.* at 545:14–25( Rabbitt testifying that the end of the year is "an incredibly, crushing busy time for the senior management at Rand," so she "would never have had enough time to hire somebody," and that "we as a company . . . don't actually terminate people around the holidays.").

Rabbitt's unhappiness with Fry's performance on November 3, 2016 had been preceded by a protracted series of performance issues between Fry and Rabbitt. In March 2016, after Fry engaged in what Rabbitt considered inadequate job performance, Rabbitt emailed Fry informing her that she was "very concerned . . . [a]bout your performance," and that Fry's performance issues "ha[d] been building up ever since the [earlier] mix-up with a potential client, Long + Foster." *See* Def.'s Ex. 4. Fry described Rabbitt at this time as "quite upset[ and v]ery close to furious." Trial Tr. 395:19. Fry testified that when she met with Rabbitt to discuss the incident, Rabbitt was very upset and "stressed out," pounding her fists and screaming that "nobody helps me." *Id* at 396:14.

In the months between the March 2016 and November 3 2016 incidents, Rabbitt confronted Fry with several more performance issues. *See* Def.'s Exs. 6, 7, 9. After an incident in August 2016, Rabbitt sent Fry and email with the subject "I am SO angry," to which Fry responded with a detailed explanation of her side of the story. Def.'s Ex. 8. In another email in

4

September 2016, Rabbitt expressed her exasperation with Fry regarding a dispute between Fry and Rabbitt's driver. Def.'s Ex. 10. Following the November 3 incident, Rabbitt confronted Fry with another performance issue on November 15, 2016, after which Fry testified Rabbitt was "chronically unhappy" with her. Trial Tr. 430:2–16.

Unbeknownst to Rand or Rabbitt, Fry had been diagnosed with multiple sclerosis in 2010. On November 17, 2016, after experiencing certain symptoms, Fry went to see her neurologist, Dr. Fishman, who concluded that Fry was experiencing a "flare-up" of her MS symptoms and recommended approximately two weeks of leave from work to reduce stress. *See* Trial Tr. 570:5–571:22. As reflected in the medical records for that visit, and as testified to by Dr. Fishman, Fry had asked whether she qualified for a disability and Dr. Fishman concluded that she did not, as she was demonstrating "no objective limitation" during her exam that would qualify her for disability. *Id.* at 570:10–571:9; Def.'s Ex. 41.

On November 21, 2017, in a meeting with Rabbitt and Bazyluk, Fry disclosed for the first time that she had MS. In her testimony, Fry describes Rabbitt's reaction to her disclosure and request as "pleasant," and noted that Rabbitt said she was "sorry to hear this" and that she had a colleague who also has multiple sclerosis. Trial Tr. 368:1–5, 370:21. Fry testified that after Fry left the room to take a call, Bazyluk asked for her age before mapping out, as Bazyluk described, "what's going to happen" with Fry's leave options, including FMLA, "from start to finish." *Id.* at 368:6–20. Bazaluck testified without any challenge by Fry that she told Fry to take as much time as she needed and provided her with various leave options. *Id.* at 146:9–147:2. Bazyluk also testified that as of November 21, "everything that Arlene said to me at that time, it implicated [*sic*] that she would be gone until the end of the year." *Id.* at 147:24–148:1. Fry testified that

5

after she informed Haglund personally about her condition and her leave, he "[c]ouldn't have been more gracious and concerned." *Id.* at 371:11–16.

Fry decided to take medical leave under the FMLA from November 28, 2016 to December 12, 2016. She delayed taking that leave until November 28, 2016 in order to satisfy Rabbitt's request that before taking leave she "bring everything up to speed." *Id.* at 370:21–23. Fry returned to work on December 12, 2016. According to Fry, after she returned from FMLA leave, she was immediately met with a series of harsh comments from Rabbitt, many laced with profanities.[5] For example, in a meeting with Fry, Haglund, and Bazyluk, Rabbitt complained that "[y]ou [Fry] left me during the busiest time of the year. I have been sick. I have been stressed . . . . Look at my eye [referring to what appeared to be a stye]. I don't take time off. I don't go away. I stay here and I work." *Id.* at 317:22–25. Fry further testified that Rabbitt pounded on the table and called her a "God damn liar," saying that "[y]ou told me you're not coming back." *Id.* at 317:11, 14. Finally, according to Fry, Rabbitt said "I want to know what this God damn thing means. . . . I want to know how it is going to affect my life." *Id.* at 23–23. According to Fry, sometime latter following her return, Rabbitt accused Fry of being "too God damn rested[,]" saying " I know you were on a cruise" during her FMLA leave. *Id.* at 325:6–8.

In the following weeks, Fry testified to other confrontations between her and Rabbitt over her performance.[6] After an issue pertaining food to be delivered to Rabbitt's home for a

---

[5] Rabbitt testified that while she has used profanity in the office, she never directed any profanity directly to Fry. *See* Trial Tr. 477:17 (Rabbitt testifying that "I cursed around her. I never cursed at her.").

[6] For example, in one incident, Rabbitt was in a meeting when Fry answered a call for her from a board member. When Fry tried to work her way through a crowded conference room to hand Rabbitt a note about the call, Rabbitt said "[t]his is ridiculous. This is so ridiculous. Just tell me who is on the damn phone," which Fry found embarrassing. *Id.* at 310:24–321:1. In a similar incident, after Fry had made some edits to a holiday party speech Rabbitt would give, Rabbitt threw the papers at her and said "I don't know why I pay you a God damn cent. You— you are a f[-]ing waste of oxygen." *Id.* at 323:22–23. On December 22,2016, when Fry showed Rabbitt the catering contract for food to be delivered to Rabbitt's house for a Christmas dinner, which Rabbitt had already approved and signed, Rabbitt said "[y]ou're f[-]ing up on purpose . . . . My meal is supposed to be delivered tomorrow [the 23rd] not Christmas Eve." *Id.* at 326:24–25; 327:5–6.

6

Christmas dinner, Fry reached out to Bazyluk, who indicated, according to Fry's testimony, that "[w]e know this relationship is toxic[,]" and that "[w]e are aware of what's going on." *Id.* at 328:12–13, 15–16. Bazyluk then asked Fry if she would be willing to work for Haglund instead of Rabbitt; Fry agreed, but expressed concern over "what he's [Haglund] heard about my work product" and whether Rabbitt would approve of the move. *Id.* at 329:2–5. The next day, December 23, over another issue related to the Christmas food delivery, Rabbitt called Fry, blamed her for the problem, saying "God damn it, Arlene[, y]ou cannot do anything right. You do this just to make me angry. You do it on purpose." *Id.* at 330:6–9. After Fry was able to fix the mistake, Rabbitt again accused her of being on a two week cruise during her FMLA leave.

The next week, on December 27, Fry met with Bazyluk and Haglund to discuss the possibility of her working for Haglund. According to Fry, Haglund was open to the idea, saying that he had always been satisfied with Fry's work and indicating that Fry should not worry about Rabbitt's reaction. Fry then testified that the next day, December 28, Rabbitt pulled Fry, Bazyluk, and Haglund into a conference room and began pounding her fists on the table, saying "Arlene works for me. She works for me. Do you understand?" *Id.* at 336:17–18. Fry testified that Rabbitt then made each of them repeat back to her, "Arlene works for you."

A third meeting occurred on December 29 with Fry, Haglund, and Bazyluk. Fry testified that Haglund informed her that he "d[id] not have enough work to justify to have an assistant of my own. So Violetta [Bazyluk] and I have tried to find other work for you to do. . . . No one has any work that needs to be done. So we cannot find a full-time job for you." *Id.* at 338:9–17. The testimony is conflicting as to who said what next. Fry testified that Bazyluk proposed that she "work for Linda [Rabbit] full time until we hire her replacement. Then you will train the replacement and you will move into the part-time position doing whatever administrative work

7

needs to be done. And on June 30th, your employment with Rand will end." *Id.* at 339:7–11. Haglund, by contrast, testified that it was Fry's idea that she work until June 30, her 64th birthday, and that Fry "helped come up with" the plan. *Id.* at 225:8, 226:25; *see also id.* at 176:7–17 (Bazyluk testifying that after hearing of the plan, Fry was "happy" and "actually thanked us for it," and that June 30, 2017 was "when she wanted to retire"). In any event, Bazyluk memorialized this proposal in an email to Haglund and Fry that afternoon. Pl.'s Ex. 17. Fry testified that she understood by the end of the December 29 meeting that she was being terminated under the proposed arrangement. Trial Tr. 439:1–3.

On January 12, 2017, Fry received an email from Haglund, containing an agreement memorializing the proposal from the December 29 meeting as well as a "Release and Waiver Agreement," Pl.'s Doc. No. 28, which waived various claims Fry might have against Rand, including claims under the ADA and FMLA. Fry testified that she "felt in [her] heart of hearts that five minutes after [she] put [her] signature on that document Rand was going to fire" her. Trial Tr. 344:1–3. Fry told Bazaluck that she wanted to review the agreement with her lawyer. *Id.* at 344:16–19.

Fry never signed the Release and Waiver. Rather, on January 23, 2017, she sent an email to Haglund, with a copy to Bazyluk, in which she said she was "writing to complain about the discrimination and retaliation that I have suffered at rand*," and that she "reject[s] the company's [release and waiver] because it is retaliation for my protected leave-taking and my revealing to the company my disability and serious health condition." Pl.'s Ex. 8. The next day, Bazyluk took Fry into Haglund's office, where they asked her to "tell [them] what's been happening that . . . you consider to be discrimination and retaliation." Trial Tr. 346:17–19. Fry responded, "[e]verything we have talked about for the past month," and gave specific examples

8

of incidents that had occurred. *Id.* at 20–21. Bazyluk then asked what proof she had, such as emails, voicemails, or witnesses, at which point Fry said she felt "very uncomfortable" and "threatened." *Id.* at 348:7. On January 27, Haglund sent an email to Fry to "follow up on our 75 minute conversation . . . and provide a more comprehensive response to" Fry's January 23 email. Pl.'s Doc. No. 11. The email recounted that Rand had been having "internal discussions" about replacing her since the November 15 incident, and provided detailed rebuttals of the specific incidents of discrimination discussed at the meeting, saying that "none of these statements, even if true, relates to a disability that you may have . . . ." *Id.* The email closed by saying that "[y]our performance in your current position was not satisfactory to Linda, and there is currently no open position for which you are qualified and you could transfer." *Id.* Haglund testified that as he understood matters, Fry could either accept the offered part-time position until June 30, or be terminated immediately, as there was no other position for her. Trial Tr. 271:10–17.

Fry replied by email on February 2, saying that Haglund "engaged in some revisionist history in light of my January 23 email," and that Haglund's "email is the first time I am learning that Linda's November 3 outburst was allegedly because of a mistake in the scheduling of an important conference call . . . ." Pl.'s Ex. 30. Fry went on to say that "[s]ince returning from my leave on December 12, 2016, Linda has been non-stop abusive toward me, and I feel that she is treating me this way because of my medical leave." Haglund responded simply "[t]here are very many misrepresentations in your email. Very sad." *Id.* At trial, Fry admitted that there were statements in her February 2 email that were untrue. Trial Tr. 443:14–444:15.

On February 3, Fry received an email from Rabbitt saying that Fry had not asked the IT department to turn on her international plan for an upcoming trip to Dublin, saying "[y]ou messed up. This is what I'm talking about. I cannot rely on you." Trial Tr. 350:6–7. After Fry

9

confirmed the plan was turned on and told Rabbit, Rabbitt replied "[w]hen I get in, you are so out of there." *Id.* at 20–21.[7] After Rabbitt returned to the office, Bazyluck asked Fry to meet with her in Haglund's office. They then discussed Fry's end of employment paperwork and benefits before Bazyluk walked Fry out of the building and to her car. *Id.* at 351:22–354:4. Haglund testified that Fry was terminated because she "didn't agree to the scenario we came up with," and "because of increased mistakes and falsehoods in her [February 2] e-mail." *Id.* at 219:1–9.

Shortly before and shortly after Fry's termination, Rand discovered that Fry had forwarded to herself or printed out emails from Rabbitt's email account that Fry thought were relevant to her claims of discrimination and retaliation. Some of these emails were messages that were related to her job duties, but others had no relationship to any job duty, including one email containing a picture of Rabbitt's stye and another involving an attorney-client communication concerning another employee that did not involve Fry in anyway. Fry's retention of these emails, allegedly in violation of Rand's personnel policies, is the basis for Rand's after-acquired evidence affirmative defense.

On April 27, 2018, the jury returned a verdict in favor of Fry with respect to Count I for retaliation under the FMLA and awarded $50,555. The jury found in favor of Rand with respect to Counts II and III under the ADA and its affirmative after-acquired evidence defense. The jury also stated, in response to a special interrogatory, that its damages award under Count I was not reduced because of Rand's after-acquired evidence defense.

## II. LEGAL STANDARD

Under Fed. R. Civ. P 50, the Court may grant a motion for judgment as a matter of law on a particular issue if the Court concludes that "a reasonable jury would not have a legally

---

[7] In a separate email from Rabbitt to Fry on February 3, Rabbitt said "[w]hen I finally take a breathe [*sic*], it will be 6 or 7 pm. You will be gone." Def.'s Ex. 32. Fry testified that this was not the email in which Rabbitt indicated she would terminate her, but another email not produced in discovery. Trial Tr. 454:23–455:8.

10

sufficient evidentiary basis to find for the party on that issue," that is, that the jury's findings on that issue are not supported by substantial evidence. *See Wilhelm v. Blue Bell*, Inc., 773 F.2d 1429 (4th Cir. 1985). In considering a motion under Rule 50, the court "may not weigh the evidence, pass on the credibility of the witnesses, or substitute [its] judgment of the facts for that of the jury." *Charleston Area Med. Ctr., Inc. v. Blue Cross and Blue Shield*, 6 F.3d 243, 248 (4th Cir. 1993) (internal citations and quotation marks omitted). While the Court must view the evidence presented at trial in favor of the non-moving party, "[t]hat deference to the jury's findings is not . . . absolute: a mere scintilla of evidence is insufficient to sustain the verdict, and the inferences a jury draws to establish causation must be reasonably probable." *Id.* Under Rule 59, "[t]he court should grant a new trial only if 1) the verdict is against the clear weight of the evidence, 2) is based on evidence which is false, or 3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 650 (4th Cir. 2002).

## IV. ANALYSIS

### a. Fry is not entitled to judgment as a matter of law on Rand's after-acquired evidence defense.[8]

In order to have prevailed on its after-acquired evidence defense at trial, Defendant needed to prove that (1) the Plaintiff was guilty of severe misconduct or wrongdoing; (2) the Defendant was unaware of her conduct; and (3) the Defendant in fact would have terminated the Plaintiff on those grounds alone if they had known of her alleged misconduct at the time of her discharge. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 362–62 (1995). Here, Defendant relies on Plaintiff's printing and emailing to herself multiple emails that were not

---

[8] Although the Court's decision to set aside the verdict as to Count I technically moots plaintiff's challenge to the jury's finding in favor of defendant on the after-acquired evidence defense, the Court rules on Plaintiff's Motion in order to facilitate complete appellate review.

11

relevant to her duties as Rabbitt's assistant. These emails included emails related to Rabbitt's health and an attorney-client communication concerning another employee.

The evidence presented, viewed most favorably to the Rand, was sufficient for a jury to reasonably conclude that the Fry had engaged in sufficiently severe misconduct. The taking of the emails violated her confidentiality agreement, *see* Def.'s Ex. A, and the policies in the employee handbook, which prohibited using the company's systems to "knowing open or review another employee's email or voicemail without authorization . . . or otherwise transmit confidential or proprietary information or materials via e-mail or the internet onto a personal device without Company authorization," Def.'s Ex. 44 at 30-31. While Fry had authorization to access Rabbitt's email for the purposes of her job, many of the emails she forwarded to herself or printed, including the email about Rabbitt's eye infection and the attorney-client communication, were not within the scope of her job duties; and Fry's accessing and printing those emails were "without authorization" and in violation of the employee handbook.

Plaintiff argues that "Defendant terminated [her] because she was 'building a case' of discrimination against Rabbitt, not because she took proprietary information." Pl.'s Reply 5. Plaintiff relies on HR Director Bazyluk's testimony that "if we start looking at everybody's e-mail in the entire world, I'm sure we would have to fire the entire world. Because everybody, somewhere at some point would forward something to their personal e-mail." Trial Tr. 196:12197:1. Bazyluk went on to testify that it would only be a fireable offense to forward oneself email with "intent . . . to use it against Rand or sell it for profit or release trade secrets to somebody else," and therefore there were grounds to terminate Plaintiff because she wanted to "use [the emails] to build a case against Ms. Rabbitt . . . ." *Id.*

Plaintiff's contemplation of protected activity (i.e., "building her case") did not give her license to engage in prohibited conduct or access or retain confidential emails—even if they are only shared with her attorney. *See Laughlin v. Metropolitan Was. Airports Auth.*, 952 F. Supp. 1129, 1137 (E.D. Va. 1997) (holding that courts in such cases "should proceed from the premise that it is a breach of the employee's obligations of honest and faithful service to purloin and disseminate the employer's documents, particularly those which deal with matters so intrinsically sensitive as personnel disputes."). Moreover, even though Rand may have been aware that Fry had already accessed some emails when it terminated her on February 3, 2017, it did not learn about the volume of emails taken, and that the attorney-client email was among them until after her termination. Overall, the evidence was sufficient for a juror to reasonably conclude that had Defendant been aware of the totality of the retained emails, it would have terminated Plaintiff.[9]

Accordingly, Defendant produced sufficient evidence at trial for a reasonable jury to have found in its favor on its after-acquired evidence defense, and Fry's Motion will therefore be DENIED.

---

[9] Plaintiff cites *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 762 (9th Cir. 1996) for the proposition that an employer may not succeed "based only on bald assertions that an employee would have been discharged for the later-discovered misconduct." *O'Day*, 79 F.3d at 762, *quoted in* Pl.'s Mem. in Supp. 14–15. However, in *O'Day,* court found " it significant that [the employer's] testimony is corroborated by both the company policy, which plausibly could be read to require discharge for the conduct at issue here, and by common sense," and that "[t]here is nothing inherently incredible about [an employer] asserting that it would discharge an employee . . . for sneaking into his supervisor's office, stealing sensitive documents pertaining to employment matters, and showing them to one of the very people affected by the documents." *Id.* Rand's after-acquired evidence defense is similarly supported by the testimony of the relevant decision-makers at Rand—Rabbit, Haglund, and Bazyluk—and corroborated by the employee handbook admitted into evidence, as well as common sense. Fry also argues that the evidence was insufficient to sustain Rand's after-acquired evidence defense because the jury needed to rely on testimony from "interested witnesses," particularly Rabbitt. *See* Fry Reply 8 ("As discussed below, *every single case cited by Defendant supports this notion that the testimony of its own interested witnesses is not enough to meet its burden.*") (emphasis in original). But if Plaintiff's approach to this element of the after-acquired evidence defense were adopted, it would be difficult for a company to make out the defense, since only "interested witnesses" are typically involved in the termination giving rise to the claim.

### b. The evidence at trial was insufficient to support the verdict on FMLA retaliation (Count I).

Defendant has moved for judgment as a matter of law regarding Count I for FMLA retaliation. The FMLA provides, in relevant part, that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). In order to establish a prima facie case of FMLA retaliation at trial, Fry was required to establish that (1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) such action was caused by her protected conduct. In order to show causation, a plaintiff must show that her employer would not have taken the adverse employment action but for her protected activity. *See Adams v. Anne Arundel Cnty Pub. Schs.*, 789 F.3d 422, 429 (4th Cir. 2015) ("Retaliation claims brought under the FMLA are analogous to those brought under Title VII."); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."); *see also Gourdeau v. City of Newton*, 238 F. Supp. 3d 179, 194 (D. Mass. 2017) (holding that the plain language of the FMLA requires the "but for" standard and that a contrary Department of Labor regulation is not entitled to *Chevron* deference).

"Retaliation claims can be proven by either the submission of direct evidence of retaliatory animus or the use of the *McDonnell Douglas* burden-shifting framework." *United States ex rel. Cody v. Mantech Int'l Corp.*, Nos. 17-1722, 17-1757, 2018 WL 3770141 at *7 (4th Cir. Aug. 8, 2018) (applying *McDonnell Douglas* to a motion under Rule 50; citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under *McDonnell Douglas*, the plaintiff has the initial burden of showing a *prima facie* case of retaliation based on the elements outlined above.

Once a prima facie case is established, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. The burden then shifts back to the plaintiff to demonstrate that the defendant's purported reason was simply a pretext for retaliation. *See Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015). The ultimate burden of persuasion always lies with the plaintiff.

Fry met her initial burden of making out a *prima facie* case of retaliation. The parties do not dispute that Fry's leave-taking was protected activity or that her termination was protected activity. Plaintiff argues that in addition to her leave-taking, she also engaged in protected conduct by complaining of retaliation in response to her leave-taking in emails she sent on January 23, 2017 and February 2, 2017. But the uncontested evidence is that the decision to terminate Fry's employment was made before January 23, 2017. *See* Trial Tr. 439:1–3 (Fry testifying that the plan presented at the December 29 meeting was a termination); *see also* Pl.'s Ex. 8 (Fry complaining that the proposal that she leave the company by June 30, 2017 was "retaliation for [her] protected leave-taking"). For these reasons, the evidence, viewed most favorably to Fry, establishes that the only protected activity that could have occurred before Rand decided to terminate Fry is her leave-taking from November 28 to December 12, 2016.

Fry has also established the causation element of her *prima facie* case through demonstrating a temporal proximity between her taking FMLA leave between November 23 and December 12, 2016 and the decision to terminate her that was conveyed to her on December 29, 2016. *See, e.g., Foster*, 787 F.3d at 253(a one month temporal proximity between protected activity and termination "*tends to show causation*."); *King v. Rumsfeld*, 328 F.3d 145 at 151 n.5 (4th Cir. 2003) (holding that a two and a half month gap between an employee's protected

15

activity and her termination was sufficient to meet the plaintiff's *prima facie* causation burden, but not to overcome the defendant-employer's proffered legitimate reason).

Fry having established her prima facie case, Rand was obligated to assert a legitimate non-retaliatory reason to avoid liability. Rand satisfied that burden by asserting that Fry was terminated due to problems with her job performance that predated her FMLA leave. That assertion shifted the burden back to Fry to introduce evidence that Rand's proffered reason was untrue or a pretext for retaliation.

Fry failed to carry that burden. She failed to introduce evidence from which a jury could reasonably find that Rand's proffered reason was untrue or a pretext. Fry herself confirmed that Rabbitt's unhappiness with her performance was long standing and deeply rooted. Fry failed to present evidence sufficient to allow a reasonable juror to essentially ignore Rand's uncontradicted evidence that Rabbitt had made the decision to terminate her after the performance issues that occurred in November, 2016—before Fry requested FMLA leave or disclosed her MS—even though that decision was not implemented until after she returned from FMLA leave. Where, as here, the employer-defendant had already decided to terminate the employee before she engaged in protected conduct, the employer is entitled to "proceed[] along lines previously contemplated," even if the timing and other details are "not yet definitively determined." *Clark v. Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001).

In attempting to establish causation in the face of Rand's proffered reason for termination, Fry relies heavily on *Williams v. Ricoh Americas, Corp.*, 203 F. Supp. 3d 692 (E.D. Va. 2016) and Rabbitt's abusive statements following Fry's return. The *Williams* case involved an employer who had tolerated an employee's below-average performance, but began to "subject" that employee "to increased scrutiny and discipline only *after* his [protected activity],"

16

giving rise to a reasonable inference of retaliation. *Williams*, 203 F. Supp.3d at 698. *Williams* is distinguishable on its facts. In that case, there was evidence that after the employee's protected activity, the employer "made the decision at [that] moment that [he] would document significant issues" with the employee's performance that had previously gone undocumented. *Id.* Here, there is no evidence of Rand documenting as unacceptable previously accepted performance issues; Fry's performance issues had been well documented for months before her protected activity.

Even if the jury had accepted wholesale Fry's disputed recollections of Rabbitt's comments after she returned from leave, those comments do not give rise to a reasonable inference of animus towards FMLA leave-taking.[10] Indeed, based on Fry's own testimony, there was little difference in Rabbitt's disposition toward her before and after her FMLA leave; Fry testified that Rabbitt was "chronically unhappy" with her after the November 15 incident and that her performance issues, or at least Rabbitt's perception of her performance issues, continued after she returned from leave. Ultimately, Fry's evidence of causation reduced to nothing more than evidence of temporal proximity that was insufficient to allow a jury to find in Fry's favor in the face of the evidence showing Rand's legitimate decision to terminate Fry based on longstanding performance issues that predated Fry's leave-taking. The jury's verdict with respect to Count I must therefore be set aside. For the same reasons, because the weight of the evidence is so heavily in favor of Rand as to Count I, the Court conditionally orders a new trial if the judgment is later vacated or reversed.

---

[10] For example, Rabbitt's accusation, as related by Fry, that Fry was "on a cruise" during her FMLA leave does not evidence animus toward FMLA leave taking but, at most, an animus toward abusing FMLA leave taking or taking it for improper purposes. *See e.g., Mehta v. Potter*, 07-cv-1257 (AJT/TRJ), 2009 WL 1598403, at *9-10 (comments by employer that an employee was "making things hard for yourself" and "mean[s] nothing to me" in response to FMLA activity did not "evince retaliatory animus").

## IV. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Plaintiff's Rule 50 Motion for Judgment as a Matter of Law [Doc. No. 130] be, and the same hereby is, DENIED; and it is further

ORDERED that Defendant's Motion for Judgment as a Matter of Law or for a New Trial [Doc. No. 133] be, and the same hereby is, GRANTED; and it is further

ORDERED that the verdict in favor of Plaintiff as to Count I be, and the same is, hereby is VACATED and set aside, and judgment shall be ENTERED in favor of Defendant as to Count I; and it is further

ORDERD that in the event this Order is later vacated or reversed a new trial be, and the same hereby is, conditionally GRANTED as to Count I.

The Clerk is directed to forward copies of this Order to all counsel of record and to enter judgment in favor of Defendant Rand pursuant to Fed. R. Civ. P. 58.

/s/
_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
August 22, 2018